## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NSX OPERATING CO., LLC,                        :
                                               :
                    *Plaintiff and*            :
                    *Counterclaim-*            :
                    *Defendant,*               :
        v.                                     :        2:25-cv-02129
                                               :
SPRING COATING SYSTEMS-AMERICAS                :
CORP. (D/B/A SPRING COATING                    :
SYSTEMS USA AND SPRING COATING                 :
SYSTEMS,                                       :
                                               :
                    *Defendant and*            :
                    *Counterclaim-*            :
                    *Plaintiff.*               :

## MEMORANDUM

### I.    INTRODUCTION

In this lawsuit, Plaintiff/Counterclaim-Defendant NSX Operating Co., LLC (NSX) alleges that Defendant Counterclaim-Plaintiff Spring Coating Systems (SCS) infringes on its patent, U.S. Patent No. 9,897,921 ('921 patent) entitled *Compositions Comprising Mineral Sprits and Methods Related Thereto.* That patent relates to Flexography: a type of relief printing that uses flexible sheets of photopolymer to transfer an image onto a substrate such as plastic film, bags, or paper. Critical to the '921 patent, and at issue in this suit, is the chemical platewash solvent used during the process to manufacture and apply the relief images onto certain surfaces.

More specifically, NSX asserts that SCS's ECOWASH product infringes on the chemical composition of the platewash solvent claimed in the '921 Patent. SCS

1

counters in part that the '921 patent is invalid because certain key terms are indefinite. To that end, the parties have submitted to this Court three terms of the '921 patent for construction. On November 20, 2025, this Court heard the parties presentation tutorial on flexographic platewashing to better understand the nature of the technology at issue. On February 10, 2026, the Court held a *Markman*[1] hearing and now resolves the disputed constructions.

## II.    LEGAL STANDARD

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (citation and quotation marks omitted). "When construing a claim, words are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art [POSITA] when read in the context of the specification and prosecution history." *LoganTree LP v. Fossil Grp., Inc.*, No. 1:21-CV-00385-JDW, 2024 WL 1406539, at *2 (D. Del. Apr. 2, 2024) (Wolson, J.) (cleaned up). "[T]here is no magic formula or catechism" for construing patent claims, "[n]or is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict" unambiguous claims. *Phillips*, 415 F.3d at 1324. So long as courts heed this injunction, they are free to attach the appropriate weight to the record "sources in light of the statutes and policies that inform patent law." *Id.*

---

[1]    *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

"In some cases, the ordinary meaning of claim language as understood by [POSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "If the meaning isn't readily apparent, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *LoganTree LP*, 2024 WL 1406539, at *2 (quoting *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001)). If construction requires further review, a court may look to extrinsic evidence, cognizant of its potential unreliability and bias. *Id.* (citing *Phillips*, 415 F.3d at 1318).

A court may depart from a word's ordinary and customary meaning under two circumstances: (1) when the patentee sets out a definition and acts as his own lexicographer; or (2) when the patentee disavows the full scope of a claim term either in the specification or during the prosecution. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

> A patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history … The intrinsic evidence must clearly set forth or clearly redefine a claim term so as to put [a POSITA] on notice that the patentee intended to so redefine the claim term.

*Alnylam Pharms., Inc. v. Moderna, Inc.*, 138 F.4th 1326, 1333 (Fed. Cir. 2025) (cleaned up).

The court must interpret claims "with an eye toward giving effect to all terms in the claim … and [r]eadings that render claim language superfluous or meaningless

are disfavored. *LoganTree LP*, 2024 WL 1406539, at *2 (citing *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010)).

### III.    CONSTRUCTION OF DISPUTED TERMS

#### a.  Mineral Spirits[2]

| NSX's Proposed Construction | SCS's Proposed Construction | Court's Construction |
|---|---|---|
| "a petroleum-derived liquid comprising aliphatic and/or aromatic hydrocarbons that is also known as white, spirit, mineral turpentine, turpentine substitute, petroleum sprits, solvent naphtha (petroleum), varsol, or Stoddard solvent; typically, it is a mixture of aliphatic and alicyclic C7 to C12 hydrocarbons with a maximum content of 25% of C7 to C12 aromatic hydrocarbons" | Indefinite.<br><br>Alternatively, if not found indefinite: "A natural, non-synthetic liquid comprising aliphatic and/or aromatic non-isoparaffinic, C7-C12 hydrocarbons with an aromatic content no less than .2 wt%" | "a petroleum-derived liquid comprising aliphatic and/or aromatic hydrocarbons that is also known as white, spirit, mineral turpentine, turpentine substitute, petroleum sprits, solvent naphtha (petroleum), varsol, or Stoddard solvent; typically, it is a mixture of aliphatic and alicyclic C7 to C12 hydrocarbons with a maximum content of 25% of C7 to C12 aromatic hydrocarbons" |

As stated above, the claims of a patent must be analyzed from the perspective and understanding of a person of ordinary skill in the art (POSITA) at the time of the invention. *Phillips*, 415 F.3d at 1313. NSX suggests that "a POSITA would have at least a bachelor's degree in chemistry or a related field, or at least four years of experience in developing, testing, and/or using flexographic platewash solvents." NSX Opening Br. at 9. SCS's briefing does not address a POSITA's qualifications in

---

[2]    This term appears in Claims 10, 11, 12, 14, 17, and 20 of the '921 Patent.

this context.  Accordingly, this Court adopts NSX's common sense approach regarding who the '921 patent should reasonably inform.

NSX's briefing also highlights the inventor's intention in the '921 patent to act as lexicographer.  NSX Opening Br. at 10-11.  True to the Federal Circuit's guidance, the '921 patent's intrinsic evidence clearly sets forth "mineral spirits" so as to put a POSITA on notice that the patentee intended to redefine the claim term.  *See Alnylam Pharms., Inc., supra.*  Within the '921 patent, "mineral spirits" appears under the title "Definitions."  '921 patent, col 4, line 3.  The term is set off in quotation marks. '921 Patent, col. 4, line 46.  Additionally, the definitional sentence uses the "[a]s used herein … refers to," demonstrating the patentee's intent to construct a definition specific to the '921 patent.  '921 patent, col 4, line 46.

SCS does not meaningfully address NSX's contention that it acted as its own lexicographer.  Instead, SCS asserts that the term mineral spirits is indefinite.  SCS advances its indefiniteness theory in two principal ways.  First, SCS argues that the '921 patent uses the terms "mineral spirits" and "odorless mineral spirits" interchangeably, despite the applicant's unequivocal statements during the prosecution of the '921 patent emphasizing that the terms are not interchangeable. SCS Opening Br. at 8.  Second, SCS argues that under the doctrine of claim differentiation "mineral spirits" and "odorless mineral spirits" renders certain claims indistinct.  *Id.*

"A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with

reasonable certainty, those skilled in the art about the scope of the invention." *Pioneer Hi-Bred Int'l Inc. v. Syngenta Seeds, LLC*, No. CV 22-1280-RGA, 2023 WL 6660990, at *2 (D. Del. Oct. 12, 2023) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)) (cleaned up).

As an initial matter, the Court cannot adopt SCS's alternative definition because it does not comport with a POSITA's understanding of the related science. NSX has advanced persuasive argument that "organic" does not mean "non-synthetic" but instead means carboned based. *See* NSX Resp. Br. at 5-6; 2/10/26 Tr. at 51. Accordingly, the Court finds no basis in the evidence presented to adopt SCS's alternative definition.

Next, the Court is constrained to agree with NSX that mineral spirits is neither indistinct nor indefinite. The focus of this dispute is best contextualized by looking at the '921 Patent itself.

> **18.** A composition comprising:
>    (a) **odorless mineral spirits** having an aromatic content of less than 1 wt %;
>    (b) diisopropylbenzene; and
>    (c) at least one alcohol selected from benzyl alcohol and cyclohexanol,
>    wherein dipropylene glycol methyl ether is absent.
>
> **20. The composition of claim 18,** wherein the mineral spirits are present in an amount of about 49 wt%, the at least one alcohol is present in an amount of about 20 wt %, and the diisopropylbenzene is present in an amount of about 28 wt%.

'921 patent, col 16, ln. 34-41, 44-48 (emphases added). SCS argues that because Claim 20 uses the term "mineral spirits" when referencing Claim 18 (which discusses

6

"odorless mineral spirits"), that those terms are used interchangeably and are thus, indistinct and indefinite.

While this argument presents as non-frivolous, in this Court's view, Claim 20 sufficiently incorporates the specifications in Claim 18 by reference. *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1319 (Fed. Cir. 2005) (holding that an antecedent basis can be present by implication). Stated differently, Claim 20 tells us *what kinds* of mineral spirits we are referring to by beginning with "[t]he composition of claim 18, wherein…" *Id.*; *see also* 2/10/26 Tr. at 67-68. (NSX's counsel explaining Claim 20 is sufficiently clear by way of reference to the specifications in Claim 18). Thus, NSX's definition in Claim 18 "mineral spirits" is sufficiently distinct and not made indefinite when read in the context of the entire patent.

### b. Odorless Mineral Spirits[3]

| NSX's Proposed Construction | SCS's Proposed Construction | Court's Construction |
|---|---|---|
| "mineral spirits having only a mild odor, or in some instance, no odor. In various aspects, odorless mineral sprites may be mineral spirits that have been further refined, so as to decrease the amount of aromatic constituents that are present." | Indefinite. | Indefinite. |

---

[3]    This term appears in Claims 1 and 18 of the '921 Patent.

Having found the term "mineral spirits" is sufficiently distinct from the term "odorless mineral spirits" the Court must now address the latter's independent construction. As previously stated, SCS's primary argument in support of its desired claim construction is that the above terms, as used in the '921 Patent, "cannot be rendered distinct under any possible construction." SCS Opening Br. at 8. This Court disagrees with that assessment. However, the term "odorless mineral spirits" presents its own indefiniteness issues as used in the patent.

While NXS has properly offset "odorless mineral spirits" to indicate its intention to redefine the term, the actual definition is elusive at best. For example, the formulation "having only a mild, or in some instances, no odor" gives the Court pause. '921 patent, col 4, ln. 56-58. The subjectivity inherent in this statement negatively impacts its ability to put a POSITA on notice as to its description or use. Further, the rest of NSX's definition does little to reveal a discernible principle. "In various aspects, odorless mineral sprits *may be* mineral spirits that have been further refined, so as to *decrease the amount of aromatic constituents* that are present." *Id.* at ln. 58-61 (emphases added). This part of the definition seems to describe what one *might* do in order to achieve low or no odor but does not give a POSITA any objective indication as to whether – or when – that process is required or a reasonably calculable end result. Put simply, how does one know if the odor is sufficiently low?

During the claim construction hearing the concept of "odorless mineral spirits" was revealed to be even more nebulous than the Court had previously understood.

Counsel for NSX explained that there are many factors, some of which do not seem to be accounted for by the definition, which might impact the odor of mineral spirits. Counsel explained that "aromantic content is not the only material that affects the odor of odorless mineral spirts." 2/10/26 Tr. at 36. Counsel noted further that "[a]n aromatic content certainly can affect the smell of a chemical component, but it is not the only thing that can affect the smell." *Id.* at 37, ln. 21-23. In this Court's view, the explanation works to compound the subjectivity problems highlighted above. Not only is the level of smell, necessarily in the nose of the beholder, hard to pin down, but the contents of what constitutes "odorless mineral spirits" seems to be without scope, so long as the smell is "low" enough.

The Court acknowledges that great deference is owed to a patentee when acting as lexicographer. However, the above definition of "odorless mineral spirits" creates a zone of uncertainty such that the public is unapprised of what is still open to them. *See Nautilus, Inc.*, 572 U.S. at 909. In this Court's view, it is doubtful that a POSITA could ascertain a workable objective standard for "odorless mineral spirits" such that the definition is not wholly dependent on a person's subjective opinion of how pungent the odor might be. *See Personalized User Model LLP v. Google Inc.*, No. CIV. 09-525-LPS, 2012 WL 295048, at *22 (D. Del. Jan. 25, 2012); *see also Versata Software, Inc. v. Zoho Corp.*, 213 F. Supp. 3d 829, 835 (W.D. Tex. 2016).

The Court also acknowledges that chemistry may make it difficult to predict with any reasonable certainty how different senses may react to a particular chemical composition. However, in the standard set out by NSX, the definition lacks sufficient

9

objectivity because no notice is given to the universe of components that might impact the odor. *See* 2/10/26 Tr. at 36-37. In this way the "odorless mineral spirits" would not be properly viewed as a lexicographic definition, but more as an example of what "odorless" means. *See CSP Techs., Inc. v. Sud-Chemie AG*, No. 4:11-CV-00029-RLY, 2013 WL 2421943, at \*12 (S.D. Ind. June 3, 2013), *aff'd*, 643 F. App'x 953 (Fed. Cir. 2016). Accordingly, the Court finds the term "odorless mineral spirits" is indefinite.

### c. "About"

At this juncture, the Court's only job is to construe the term "about" in light of the '921 Patent. The parties agreed at the *Markman* hearing that industry standards regarding significant digit reporting contemplate flexibility at least to the next digit enumerated, *without* adding "about" to the construction (i.e., a claim of 49% captures 48% and 50% without the "about" hedging language). *See* 2/10/26 Tr. at 101-103, 106. This agreement, in effect, invalidates SCS's proposed construction, which sought to establish .5 wt. % as the incremental flexibility contemplated by "about."

The Court observes however that the use of "about" throughout the '921 Patent lends some credence to SCS's proposed construction. *See* SCS Opening Br. at 13. For example, a portion of the detailed description of Mineral Spirits in the Patent reads as follows:

> In a further aspect, the mineral spirits are present in an amount of about 55 wt %. In a still further aspect, the mineral spirits are present in an amount of about 54 wt %. In yet a further aspect, the mineral spirits are present in an amount of about 53 wt %. In an even further aspect, the mineral spirits are present in an amount of about 52 wt %. In a still further aspect, the mineral spirits are present in an amount of about 51 wt%. In yet a further aspect, the mineral spirits are present in an amount of about 50 wt %. In an even further aspect, the mineral spirits

10

are present in an amount further aspect, the mineral spirits are present in an amount of about 49 wt %. In a still further aspect, the mineral spirits are present in an amount of about 48 wt %. In yet a further aspect, the mineral spirits are present in an amount of about 47 wt %. In an even further aspect, the mineral spirits are present in an amount of about 46 wt %. In a still further aspect, the mineral spirits are present in an amount of about 45 wt %.[4]

'921 patent, col 6, ln. 6-22.

The fact that numbers go from one whole-digit weight percentage to the very next whole-digit weight percentage presents as good intrinsic evidence that "about" must contemplate some amount in between each whole-digit, or integer, weight percentage. This understanding is buttressed by the fact that NSX argues that where whole-digit X (without "about") necessarily contemplates X+1 and X-1, "*about* X" must contemplate some additional flexibility. Practically, if 52 wt. % (without "about") is already understood to contemplate 51 wt. % and 53 wt. %, then listing "about 51 wt. %, about 52 wt. %, about 53 wt. %" does very little to inform a POSITA that "about" means flexibility *beyond* the next whole-digit It is redundant.

However, as mentioned above, SCS backed off of this construction during the hearing. The question for this Court then becomes how much additional flexibility does "about" import into the claimed weight percentages? In *Merck & Co. v. Teva Pharms. USA, Inc.*, the Federal Circuit held that the term "about" carried a typical and ordinary meaning of "approximately." 395 F.3d 1364, 1369 (Fed. Cir. 2005). District courts within the Third Circuit have also recognized that "about" can become

---

[4]    While the Court noted at the hearing a potential concern as to whether an about 10 wt. % range as noted here provides sufficient notice to a potential infringer, that issue is not presently before the Court and does not require resolution at the claim construction stage.

indefinite if the defined range is essentially boundless.  *See Exeltis USA, Inc. v. Lupin Ltd.*, No. CV 22-434-RGA, 2023 WL 2306736, at *6 (D. Del. Mar. 1, 2023) (finding "about" indefinite when the specification purported to cover plus or minus 10% of the specific value).

In this instance, and based on the agreement of the parties, "about X" must contemplate some additional flexibility beyond the next integer, i.e., beyond X-1 and X+1.  Undoubtedly, NSX uses "about" in seriatim form to cover a broad range of values.  The specifications in collum 7 are illustrative on this point.

> In further aspect, the at least one alcohol is present in an amount of from about 5 wt % to about 35 wt %. In still further aspect, the at least one alcohol is present in an amount from about 10 wt % to about 35 wt %.  In yet a further aspect, the at least one alcohol is present in an amount from about 15 wt % to about 35 wt % …

'921 patent, col 7, ln. 43-48.  While this breadth of the range described is notable, the Court cannot say that a POSITA would not be informed as to the scope of "about" a specific value or range of values as they are used in the patent.  Further, the Court views SCS's own tolerance standards for its ECOWASH product as important extrinsic evidence in making its determination.  *See* NSX Opening Br. at 24-25. Additionally, SCS seemed to agree with using its own tolerance standards of +/- 2 wt. % at the *Markman* hearing.  2/10/26 Tr. at 107. The tolerance standards of +/- 2 wt. % were not contested by NSX at the hearing.  Accordingly, the Court will adopt the standard tolerance of plus or minus two percentage points, which is consistent with the briefing and apparent practice of the parties.

## IV.    CONCLUSION

For the stated reasons, the Court adopts the constructions identified above.

An appropriate order to follow.


BY THE COURT:

_____
GAIL WEILHEIMER          J.